# CIRCUIT COURT OF THE CITY OF CHESAPEAKE

Tri-Port Terminals, Inc.

v.

Hitch Southern Branch
Terminal, L.L.C.

December 6, 2013

Case No. (Civil) CL13-1226

BY JUDGE JOHN W. BROWN

This matter is before the Court on the parties' cross-motions for summary judgment. Following the extensive briefing and arguments of counsel, the Court is of the opinion that both motions should be denied.

Tri-Port Terminals, Inc., filed a complaint seeking a temporary injunction and other relief (declaratory judgment and trespass to chattels) against Hitch Southern Branch Terminal, L.L.C., regarding a lease and the disposition of a loading dock, certain storage tanks, and other improvements located on the leased property. The request for a temporary injunction and the trespass to chattels count were resolved by agreed order of May 16, 2013.

Hitch filed a counterclaim, seeking a declaratory judgment that the storage tanks, loading dock, and other improvements will become its property at the termination of the lease and are not "movable fixtures" that Tri-Port may remove at the lease's end.

The following are the purportedly undisputed facts relevant to summary judgment in this matter.

Tri-Port and Hitch own adjacent parcels of land on the Southern Branch of the Elizabeth River in the City of Chesapeake; each is improved with a deepwater terminal, storage tanks, and other facilities for unloading, storing, and reshaping various liquid products, including bulk liquid fertilizer. On January 3, 1977, Hitch's predecessor in interest entered into a twenty-year lease of the Hitch terminal to the Royster Company. That lease provided in relevant part:

Royster shall have the right to make such new improvements and construct such additional facilities as it elects at Royster's expense. . . . All such improvements, other than movable fixtures and equipment, shall become the property of Hitch upon termination of this lease.

Royster constructed two bulk liquid storage tanks, Tanks 101 and 102, at the Hitch terminal later that year, as well as a truck loading dock. The storage tanks rested on compacted sand bases encircled by concrete rings and were not attached to the ground or the ring except by pipes.

Royster assigned the lease to Tri-Port on June 30, 1986, including Royster's rights, title, and interest in the tanks and loading dock. At that time, Royster likewise sold its assets at the Hitch terminal to Tri-Port under the terms of an asset purchase agreement. The agreement provided for the sale of enumerated "real property, furniture, fixtures, and equipment. . . ." The enumerated list included "2 – 10,000 ton storage tanks (w/pumps, piping, blending system, insulation)" and a "Tank Loading Station." Royster contemporaneously drafted and recorded a deed of trust, which granted a security interest in "all tanks, foundations, fixtures, machinery, equipment, and other casual personal property and all parts thereof and all appurtenances, additions, and accessions thereto. . . ." The deed of trust further provided that Tri-Port "is and will be at all times the owner of the improvements in building equipment, free and clear of any lien, security interest, or other charge or encumbrance. . . ." Royster recorded a deed of release, releasing the deed of trust on March 1, 1988. The deed of release operated on the aforementioned tanks.

In 2005, Tri-Port installed additional equipment for principal use with the tanks: piping, pump controls, and electrical supply. Hitch admitted in its answer that the tanks can be moved, and its expert witness agrees that the tanks, loading dock, and pump system "can be relocated to the adjacent Tri-Port property."

The City of Chesapeake requires the tanks to remain in compliance with American Petroleum Institute Standard 653, which addresses tank "inspection, repair, alteration, and reconstruction." Chesapeake City Code § 34-7. Under this standard, "reconstruction" includes tank relocation and "procedures for dismantling and reconstructing existing welding tanks that are to be relocated from their original site." The City approved Tri-Port's plans for moving the tanks from the Hitch property to the Tri-Port property, but did not issue permits in consideration of Hitch's objection. Issuance of the permits is contingent on the outcome of the instant litigation.

The summary judgment rule, Rule 3:20, provides for a disposition of matters where the only issue is a question of law and no trial is necessary because there is no genuine dispute as to any material fact. *E.g., General Accident Fire & Life Assurance Corp. v. Cohen*, 203 Va. 810, 814 (1962). Accordingly, a grant of summary judgment is proper if, in consideration

of the undisputed facts in the light most favorable to the nonmoving party, it appears that the moving party is entitled to judgment as a matter of law. *See, e.g., Andrews v. Ring*, 266 Va. 311, 318 (2003) (citations omitted). In considering the motion, the Court considers the facts and all inferences fairly drawn therefrom, and is prohibited from drawing inferences that are "forced, strained, or contrary to reason." *E.g., Dudas v. Glenwood Golf Club*, 261 Va. 133, 136 (2001) (quoting *Dickerson v. Fatehi*, 253 Va. 324, 327 (1997)).

The Supreme Court of Virginia has abundantly indicated that summary judgment "is a drastic remedy" and that "discovery ordinarily should not supplant the taking of evidence at trial. . . ." *Smith v. Smith*, 254 Va. 99, 103–04 (1997) (citations and quotation marks omitted); *see Stockbridge v. Gemini Air Cargo, Inc.*, 269 Va. 609, 618 (2005).

> Ordinarily, it is the duty of the court to construe a written contract that is clear and unambiguous on its face, but when a contract is ambiguous it is necessary to resort to parol evidence to ascertain the intention of the parties. In such cases, if reasonable people could draw different conclusions, the meaning of the contract upon the evidence presented should be submitted to the jury.

*Online Res. Corp. v. Lawlor*, 285 Va. 40, 54 (2013).

The mere fact that the import of contractual terms is at issue does not indicate that the terms are ambiguous and therefore require extrinsic evidence for their construction. *Galloway Corp. v. S.B. Ballard Constr. Co.*, 250 Va. 493, 502 (1995). Parol evidence cannot be used to explain clear and explicit contractual terms; in such a case, the writing serves as the only evidence of the parties' agreement. *Id.* Furthermore, parol evidence is not admissible to clarify patent ambiguities, those evident from the plain language of a contract. *Id.* Where the ambiguity is not evident from a facial reading of the contract, however, extrinsic evidence is admissible to determine the intention of the parties and resolve the latent ambiguity.

> An ambiguity exists when the contract's language is of doubtful import, is susceptible of being understood in more than one way or of having more than one meaning, or refers to two or more things at the same time. Normally, an ambiguity in a contact is "patent," that is, the language of the contract itself reveals that it can be interpreted in more than one way. A latent ambiguity exists where language while appearing perfectly clear at the time the contract[] [is] formed, because of subsequently discovered or developed facts, may reasonably be interpreted in either of two ways.

*Virginia Elec. & Power Co. v. Norfolk S. Ry.*, 278 Va. 444, 460 (2009) (internal citations and quotation marks omitted).

In this case, the contractual language at issue states: "All such improvements, other than movable fixtures and equipment, shall become the property of Hitch upon termination of this lease." This language is not patently ambiguous; it cannot ordinarily be interpreted in more than one way. *See id.* To the extent any ambiguity exists in the above language, it is latent.

"It is well settled that, by agreement, the parties may fix the character and control the disposition of property, which, in the absence of such a contract, would be held to be a fixture, where no absurdities or general inconvenience would result from the transaction." *Tunis Lumber Co. v. Dennis Lumber Co.*, 97 Va. 682, 686 (1899). In *Tunis*, the Supreme Court of Virginia considered lease provisions requiring the tenant to erect kilns on the property. Construing the language at issue, the Court noted the "general rule" that "buildings erected by the tenant on the leased premises, pursuant to a covenant in the lease, are not removable as trade fixtures unless the lease expressly or impliedly reserves the right to remove them." *Id.* The Court ultimately held that the kilns were to be returned to the lessor, however, as to reach the opposite conclusion "would practically annul the provision which required the lessee to erect them." *Id.* at 687.

In the case at bar, the language of the contract is ambiguous as to whether the right to remove the tanks and equipment was reserved to the lessee. Similarly, in *Bolling v. Hawthorne Coal & Coke Co.*, 197 Va. 554, 555–61 (1955), the Supreme Court examined a "Lease and Option" and "Agreement" to determine whether a lessee company was entitled to remove certain railroad coal equipment from the lands of the lessor. There were ambiguities in the two instruments regarding use of the term "improvements." *Id.* at 569 ("Here its meaning is somewhat cloudy and confused by its inclusion between the words 'equipment' and 'machinery,' and in one instance by the substitution of the word 'fixtures'."). The Court consequently considered extrinsic evidence to determine the intent of the parties, applying "the law of contracts and not the law of fixtures." *Id.* at 571.

In the instant case, this Court faces a like task in applying the law of contracts and discerning the intent of the parties. Hitch has supplied various extrinsic evidence in support of the position that the parties did not intend "movable fixtures and equipment" to include the storage tanks and loading dock. The affidavit of Carl Prendergast, who negotiated and approved the lease for Royster, indicates that the "movable fixtures and equipment" exception was intended to allow Royster to remove portable pumps and equipment used on the property, not the storage tanks and loading dock. Additionally, Royster's lawyer wrote a letter to Hitch's lawyer, recognizing Hitch's right to the tanks upon conclusion of the lease.

Arthur Hitch, III, negotiated and approved the lease on behalf of Hitch. His affidavit indicates that the parties negotiated rent concessions for Royster in recognition of the fact that Hitch would own the improvements at the conclusion of the lease. His affidavit likewise states that the exception was not intended to cover the storage tanks or loading dock.

The subsequent negotiation and transaction between Royster and Tri-Port in 1986 is irrelevant to the rights of the parties under the 1977 lease. In fact, for years after Royster assigned its interest in the lease to Tri-Port, the latter's lawyer indicated to Hitch's counsel, in a letter, that Hitch would own the tanks upon conclusion of the lease. This letter was written in the course of negotiations regarding a 7,000 pound storage tank that collapsed. The letter indicated that, because the two storage tanks already built at the facility had a capacity of 20,000 tons, Tri-Port was not responsible for replacing the destroyed tank, as the two storage tanks would revert to Hitch, for a gain of 13,000 tons in storage capacity.

This evidence is somewhat compelling; however, there are issues with the use of affidavits in this context. Rule 3:20 does not expressly address the use of affidavits, and, although the Supreme Court of Virginia has decided a number of cases involving consideration of affidavits on summary judgment without condemning the practice, *See, e.g., Nationwide Mut. Ins. Co. v. Smelser*, 264 Va. 109 (2002), it nevertheless appears problematic, especially in this case. *See Ashland v. Ashland Inv. Co.*, 235 Va. 150, 154 (1988) ("[I]t may be erroneous to dispense with the requirements of proof even when the opposing parties urge the court to do so, unless all essential facts are stipulated."); *The Turrisi Cos. v. Cole Holdings Corp.*, 86 Va. Cir. 211 (Fairfax Cnty. 2013) ("Rule 3:20 does not include affidavits and, as a general rule, trial courts do not consider affidavits on such motions."); *Daclouche v. H.B.L., Inc.*, 25 Va. Cir. 243, 246 (Fairfax Cnty. 1991). The Court does note, however, that the Rule does not prohibit the use of depositions or affidavits in opposition to a motion for summary judgment.

Tri-Port disputes the use of the affidavits from which the above facts are supplied. Hitch maintains that consent is necessary in support of motions for summary judgment for the use of affidavit testimony. Tri-Port claims that it consents to the use of affidavits that "(1) are not effectively the sole bases of support or opposition to either party's mission and (2) contain no inadmissible parol evidence to vary or contradict the" plain written terms of the documents at issue in this case. Tri-Port threatened to withdraw its affidavits to the extent Hitch does not agree to these limitations. Additionally, it is worth noting that, although Tri-Port maintains that the terms of the lease are unambiguous and thereby objects to Hitch's use of parol evidence, Tri-Port submits parol evidence of its own, *e.g.*, the 1986 assignment of the lease.

This Court, upon consideration of the ambiguous contractual language and various evidence, denies the "drastic remedy" of summary judgment to both parties. Again, the Court has a steadfast duty to ensure that there are no disputes of fact before granting summary judgment, and this duty is not fulfilled merely due to the filing of cross-motions for summary judgment. *Central Nat'l Ins. Co. v. Virginia Farm Bureau Mut. Ins. Co.*, 222 Va. 353, 356 (1981). In the absence of a definitive contractual construction established by either party, summary judgment should be denied to both. *See Cascades N. Venture, Ltd. Partnership v. PRC, Inc.*, 249 Va. 574, 581 (1995) ("Despite these explanations offered by both sides, we do not believe that either interpretation establishes a plain meaning of the disputed provisions."). Neither party has supplied such a definitive construction and supporting evidence, and, as a result, the Court declines to dispose of the matter upon submissions not entirely subject to requirements of proof. *See Ashland*, 235 Va. at 154.

The Court denies the cross-motions for summary judgment.